RENDERED: OCTOBER 29, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0657-DG

FRANK LASSITER                                                                                       APPELLANT


V.
ON REVIEW FROM COURT OF APPEALS
NO. 2017-CA-1310
WOODFORD CIRCUIT COURT NO. 16-CI-00293


WILLIAM M. LANDRUM, III, SECRETARY                                 APPELLEE
OF THE FINANCE AND ADMINISTRATION
CABINET


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**<u>AFFIRMING AND REMANDING</u>**

Frank Lassiter appeals a decision by of the Court of Appeals requiring him to comply with a subpoena *duces tecum* issued to him by William Landrum, the Secretary of the Finance and Administration Cabinet (Secretary).

In order to address this appeal this Court will consider, as a matter of first impression, the breadth of the investigative powers granted to the Secretary by virtue of KRS[1] 45.131 and KRS 42.142. More specifically, whether those statutes enable the Secretary to issue subpoenas as part of an investigation into a suspected violation of Kentucky's Model Procurement Code[2] (KMPC), and, if so, whether the Secretary may issue subpoenas to non-government employees as part of an

---

[1] Kentucky Revised Statute.

[2] KRS Chapter 45A.

investigation into a suspected violation of the KMPC. After review, we affirm and remand for proceedings consistent with this opinion.

## I. FACTS

Although this case solely concerns statutory interpretation, we believe a brief recitation of the facts will be helpful to provide context.

Lassiter is a former Kentucky state government employee; from 2008 until 2011[3] he served as Executive Director of the Office of Administrative Technology Services (OATS), which is housed within the Cabinet for Health and Family Services. Lassiter's duties as the Executive Director of OATS included oversight and management of healthcare-related information technology systems, and planning for future procurements of information technology goods and services for the state. During Lassiter's tenure in state government, Congress enacted the Patient Protection and Affordable Care Act.[4] Following its passage, Kentucky chose to develop its own benefits exchange: "Kynect." The request for proposal (RFP) to build Kynect was under development in OATS from 2010 until the RFP's issuance in July 2012.

Deloitte Consulting (Deloitte) was the only company to respond to the Kynect RFP. Deloitte's proposal included procurement of analytics software from SAS Institute, Inc. (SAS), which constituted $850,000 of the contract price. On July 19, 2012, a week after Deloitte responded to the Kynect RFP, SAS hired Lassiter as a

---

[3] After 2011 he began working in the private sector.

[4] P.L. 111-148, 124 Stat. 119 (March 23, 2010).

consultant.[5]  An SAS spokesman acknowledged that Lassiter helped SAS's efforts to win its part of the Kynect job "by advising SAS how it could help deliver anti-fraud measures to the state, as well as by helping to craft its proposal to Deloitte."[6]  In October 2012, the Commonwealth and Deloitte entered into a contract that the parties refer to as the "Master Agreement."  The Master Agreement provided for Deloitte to utilize various subcontractors to develop Kynect.  Deloitte subcontracted SAS to develop fraud analytics for Kynect.

In January 2013, the Master Agreement was modified to pay SAS $4.8 million to provide a fraud, waste, and abuse prevention system, which was five times the original estimated cost for SAS's work.  In February 2013, the Commonwealth issued payment to Deloitte, who then paid SAS.  Two weeks later, SAS issued its first payment to Lassiter for his assistance in procuring the contract.

The Secretary asserts that, under Lassiter's guidance, SAS's role quickly expanded beyond Kynect to provide anti-fraud services to other government agencies. In May 2013, SAS received a $575,000 contract to develop and maintain a fraud prevention system for the Kentucky Department of Revenue; in June 2014 SAS received another $575,000 contract to develop a fraud prevention system for the Kentucky Office of Employment Training; in December 2014 SAS received a $1.125 million contract to develop a corporate tax model for the Kentucky Department of

---

[5] Whether Lassiter's subsequent work for SAS complied with KRS 11A.040 is not at issue in this case.

[6] https://kycir.org/2016/03/03/company-with-linkto-beshear-administration-got-11-million-in-no-bid-work/ (last visited July 2020).  The link to this website was provided in the record as part of the sworn affidavit of the Finance and Administration Cabinet's Inspector General Ken Bohac.

Revenue; and, in October 2015 SAS received a $600,000 contract for additional services to the Kentucky Office of Employment and Training. Finally, in response to then Governor-elect Matt Bevin's pledge to dismantle Kynect, the outgoing administration entered into a final contract with SAS for $3.079 million to provide more than a year of fraud prevention services to the state. Lassiter was blind copied on an email from SAS containing a full draft of the contract.

It is undisputed that none of the foregoing contracts were procured via properly noticed RFPs, nor were they subjected to competitive bidding.[7] The Secretary therefore characterizes the contracts as "no-bid" contracts in violation of the KMPC and the policies and procedures of the Finance and Administration Cabinet. Lassiter, in contrast, asserts that the contracts were simply modifications to the existing Master Agreement, which were provided for in the Master Agreement.[8] Regardless of whether the contracts complied with the KMPC, which we are not called upon to determine in this appeal, their award prompted the Secretary's current investigation. After beginning his investigation, the Secretary sought Lassiter's cooperation, as he believed Lassiter was a witness with valuable information. When Lassiter refused to

---

[7] *See* KRS 45A.080.

[8] In support of this contention Lassiter cites Section 40.050 of the Master Agreement, which provides: "Pursuant to KRS 45A.210(1) and 200 KAR 5:311, no modification or change of any provision in the Contract shall be made, or construed to have been made, unless such modification is mutually agreed to in writing by the Contractor and the Commonwealth, and incorporated as a written amendment to the Contract and processed through the Office of Procurement Services and approved by the Finance and Administration Cabinet prior to the effective date of such modification or change pursuant to KRS 45A.210(1) and 200 KAR 5:311. Memorandum of understanding, written clarification and/or correspondence shall not be construed as amendments to the Contract. If the Contractor finds at any time that existing conditions make modification of the Contract necessary, it shall promptly report such matters to the Commonwealth Buyer for consideration and decision."

voluntarily cooperate with the investigation, the Secretary issued the subpoena currently at issue. The subpoena sought, among other things, evidence regarding Lassiter's relationship with SAS and the award of the contracts to SAS by the Commonwealth. Lassiter refused to comply with the subpoena. Lassiter did not argue that the subpoena was unduly burdensome or that he did not have responsive information to it. Rather, his sole argument was that the Secretary did not have the requisite authority to issue it to him, as his authority to issue subpoenas under KRS Chapter 45 did not extend to investigations into potential KMPC violations and, in any event, did not allow him to subpoena non-government employees.

The Woodford Circuit Court denied the Secretary's subsequent motion to compel Lassiter's compliance. The circuit court based its ruling upon its finding that the Secretary's subpoena power did not apply to investigations into possible violations of the KMPC. The Court of Appeals reversed.[9] It held that the Secretary's subpoena power did extend to a potential KMPC violation investigation, and it further held that the Secretary could subpoena non-government employees as part of said investigation.[10]

Additional facts are discussed below as necessary.

## II. ANALYSIS

This appeal involves two distinct, yet interwoven issues. First, do the investigatory powers granted to the Secretary by KRS 45.131 and KRS 45.142 allow

---

[9] *Landrum v. Lassiter*, 2017-CA-001310-MR, 2018 WL 6132283 (Ky. App. Nov. 16, 2018).

[10] *Id.*

the Secretary to issue subpoenas as part of an investigation into a suspected violation of the KMPC. And, under the aforementioned statutes, is the Secretary permitted to issue subpoenas to non-state employees as part of an investigation into a potential violation of the KMPC.

As this case concerns statutory interpretation, we begin by reiterating our long-standing principle that

> [i]n construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration. We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes. We also presume that the General Assembly did not intend an absurd statute or an unconstitutional one.[11]

With these principles in mind, we will address each issue in turn.

## A. The Secretary's subpoena power extends to investigations into possible violations of the KMPC.

The Secretary of the Finance and Administration Cabinet is "the chief financial officer of the state and the adviser of the Governor and the General Assembly in financial matters, and shall at all times protect the financial interests of the state."[12] Further, under the KMPC, the Secretary is the chief purchasing officer of the state

---

[11] *Rice v. Commonwealth*, 492 S.W.3d 563, 564 (Ky. 2016) (quoting *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky.2011)) (internal citations omitted).

[12] KRS 42.012.

6

"who shall be responsible for all procurement of the Commonwealth," except as otherwise provided by statute.[13]

The first statute at issue in this case, KRS 45.131, directs that

> The Finance and Administration Cabinet, the Chief Justice, and the Legislative Research Commission for their respective branches of government **shall investigate any alleged mismanagement of any of the affairs of the state by any officer, employee, or governing body responsible within their respective branches of government for the carrying out of any state function or the management of state funds** and shall recommend the removal of any unnecessary officer or employee and of any officer or employee who they find has grossly mismanaged any state affairs within their respective branches of government.[14]

The second statute, KRS 45.142, which contains the Secretary's power to issue subpoenas, reads:

> For the purpose of enforcing the provisions of this chapter and those sections of KRS Chapters 41, 45, and 48 relating to the state budget and financial administration, the secretary of the Finance and Administration Cabinet, the Chief Justice, and the Legislative Research Commission, for their respective branches of government, or any officer or employee designated by them, shall have free access during business hours to all books, reports, papers, and accounts in the office or under the care or control of any budget unit of their respective branches of government, and may administer oaths, certify to official acts, issue subpoenas, compel the attendance of witnesses and the production of testimony **touching any subject properly under investigation by them,** and may compel the production of books, papers, and accounts. If any person fails to comply with the order of, or to obey a subpoena issued by them or their designated agents, or refuses to testify as a witness to any matters regarding which he may be lawfully interrogated, the judge having jurisdiction of the person to whom the order or subpoena was issued may, on their

---

[13] KRS 45A.030(3).

[14] (emphasis added).

> application compel obedience by proceedings for contempt as in the case of disobedience of a subpoena or order issued from such court or a refusal to testify therein, and may adjudge such person guilty of contempt of court and punish him as provided by law in other contempt cases.[15]

The primary basis for Lassiter's argument that the Secretary's subpoena power does not extend to investigations into potential KMPC violations is that KRS 45.142 does not include a reference to KRS Chapter 45A, i.e. the KMPC. Specifically, that the first line of KRS 45.142 reads: "[f]or the purpose of enforcing the provisions of this chapter and those sections of KRS Chapters 41, 45, and 48...," but does not mention KRS Chapter 45A. We disagree.

While Lassiter is clearly correct that KRS 45.142 does not directly reference KRS Chapter 45A, it does state that its purpose is to enforce KRS Chapter 45. And KRS 45.131, which of course is part of KRS Chapter 45, requires the Finance and Administration Cabinet to "investigate **any** alleged mismanagement of **any** of the affairs of the state by any officer, employee, or governing body."[16] In addition, KRS 45.142, which is also a component of Chapter 45, arms the Secretary with several investigative tools, including the power of subpoena, to gather evidence "touching **any** subject properly under investigation by [him]." It does not say, as Lassiter would have us hold, "touching any subject properly under investigation by the Secretary *except* investigations into possible violations of KRS Chapter 45A." Rather, it is more probable that the General Assembly did not include KRS Chapter 45A in the language of KRS 45.142 because its directive to investigate *any* alleged

---

[15] (emphasis added).

[16] (emphasis added).

mismanagement of *any* subject properly under the Secretary's investigation was broad enough to encompass the KMPC, assuming of course that the KMPC is a subject properly under his investigation.

Therefore, it seems that the real question before us is whether a possible violation of the KMPC is a "subject properly under investigation" by the Secretary. Even a cursory inspection of the KMPC demonstrates that the answer to that question is a resounding "yes."

The KMPC applies "to every expenditure of public funds by this Commonwealth and every payment by contingency fee under any contract or like business agreement."[17] In addition to the Secretary's duties as chief financial officer of the state who is charged at all times with protecting the financial interests of the state,[18] the KMPC delegates to the Secretary the duty of being the chief purchasing officer of the state with the responsibility for **all** procurements of the Commonwealth.[19] Further, the KMPC directs that

> [t]he secretary of the Finance and Administration Cabinet shall have power and authority over, and may, except as otherwise expressly provided in this code, adopt regulations pursuant to KRS Chapter 13A and consistent with this code governing the purchasing, management, and control of any and all supplies, services, and construction, and other items required to be purchased by the Commonwealth. The secretary shall consider and decide matters of policy with regard to state procurement. The secretary shall have the power of review with respect to the implementation of regulations and policy determinations.[20]

---

[17] KRS 45A.020(1).

[18] KRS 42.012.

[19] KRS 45A.030(3).

[20] KRS 45A.035(1).

The KMPC thus makes the Finance and Administration Cabinet directly responsible for the promulgation of regulations for procurements by the Commonwealth.[21] Consequently, "[n]o purchase or contract shall be binding on the state or any agency thereof unless approved by the Finance and Administration Cabinet or made under general administrative regulations promulgated by the cabinet."[22] Suffice to say, our General Assembly saw fit to give the Finance and Administration Cabinet and its Secretary a great deal of authority over procurements made by the Commonwealth under the KMPC.[23]

---

[21] *See also* KRS 45A.045(2) ("The Finance and Administration Cabinet shall recommend regulations, rules, and procedures and shall have supervision over all purchases by the various spending agencies, except as otherwise provided by law, and, subject to the approval of the secretary of the Finance and Administration Cabinet, shall promulgate administrative regulations to govern purchasing by or for all these agencies.").

[22] *Id.*

[23] *See also, e.g.*, KRS 45A.230 ("Prior to the institution of any action in a court concerning any contract, claim, or controversy, the secretary of the Finance and Administration Cabinet is authorized, subject to any limitations or conditions imposed by regulations, to settle, compromise, pay, or otherwise adjust the claim by or against, or controversy with, a contractor relating to a contract entered into by the Finance and Administration Cabinet on behalf of the Commonwealth or any state agency, including a claim or controversy based on breach of contract, mistake, misrepresentation, or other cause for contract modification or rescission, but excluding any claim or controversy involving penalties or forfeitures prescribed by statute or regulation where an official other than the secretary of the Finance and Administration Cabinet is specifically authorized to settle or determine such controversy."); KRS 45A.235 (This section shall apply to a claim or controversy arising under contracts between the Commonwealth and its contractors. If such a claim or controversy is not resolved by mutual agreement, the secretary of the Finance and Administration Cabinet, or his designee, shall promptly issue a decision in writing….The decision shall be final and conclusive unless fraudulent, or unless the contractor sues pursuant to KRS 45A.245."); and KRS 45A.285 ((1) The secretary of the Finance and Administration Cabinet, or his designee, shall have authority to determine protests and other controversies of actual or prospective bidders or offerors in connection with the solicitation or selection for award of a contract. (2) Any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or selection for award of a contract may file a protest with the secretary of the Finance and Administration Cabinet. (3) The secretary of the Finance and Administration Cabinet shall promptly issue a decision in writing. (4) The

It follows, then, that the Secretary's mandate to at all times protect the financial interests of the state, and his wide-reaching authority over procurements made by the state, would bring a possible violation of the KMPC well-within his authority to investigate.

Lassiter further argues that the Secretary's asserted interpretation of the statutes confers upon him a subpoena power that is too broad. But our case law has previously supported broad investigatory powers, more commonly referred to as "powers of original inquiry," for administrative bodies charged with upholding the laws of the Commonwealth.

For example, in *Commonwealth ex rel. Hancock v. Pineur*, this Court addressed the power of the Attorney General to issue an "investigative demand" under KRS 367.240 to an officer of four corporations that sold mobile homes in Kentucky.[24] In particular, "whether there is either a statutory or constitutional requirement that a demand authorized by KRS 367.240 recite on its face the reason or grounds for its issuance[.]"[25]

This Court began by noting that under KRS 367.240 the Attorney General could "execute and cause an investigative demand to be served in either one of two instances."[26] First, if he "has reason to believe that a person has engaged in, is engaging in, or is about to engage in any act or practice declared to be unlawful by

decision by the secretary of the Finance and Administration Cabinet shall be final and conclusive.").

[24] 533 S.W.2d 527 (Ky. 1976).

[25] *Id.* at 528.

[26] *Id.*

11

KRS 367.110 to 367.300 (Kentucky's Consumer Protection Act statutes)" or "when he believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in, is engaging in or is about to engage in, any act or practice declared to be unlawful by KRS 367.110 to 367.300[.]"[27]

To address the power of the Attorney General to issue investigative demands, this Court relied heavily upon the seminal case of *United States v. Morton Salt Co.*,[28] which it identified as a "living bible" on "matters concerning the implementation of the investigative powers of administrative agencies."[29] It then went on to quote extensively from *Morton Salt*.[30] The most pertinent of which for our purposes is the following:

> [t]he only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, **it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry**. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand [Jury], which does not depend on a case or controversy for power to get evidence **but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not**. **When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform**

---

[27] *Id.*

[28] 338 U.S. 632 (1950).

[29] *Pineur*, 533 S.W.2d at 529.

[30] *Id.*

12

**itself as to whether there is probable violation of the law**.[31]

Accordingly, this Court upheld the Attorney General's issuance of the investigative demand, noting that while KRS 367.240 required that one of its two conditions be present, "nowhere does it say or imply that the condition must be recited on the face of the demand."[32]

In a more recent case, *Dolomite Energy, LLC v. Commonwealth Office of Financial Institutions*, the Court of Appeals addressed the validity of a subpoena issued by the Commonwealth's Office of Financial Institutions, Division of Securities (Commonwealth), to Dolomite Energy, LLC (Dolomite) because it suspected Dolomite had violated KRS Chapter 292, Kentucky's Uniform Securities Act.[33] Dolomite's primary claim was that the Commonwealth's investigative subpoena exceeded the Commonwealth's authority.[34] Dolomite argued that, although it was located in Kentucky, it did not solicit or do business with Kentucky residents, and therefore the Commonwealth had no power to issue subpoenas to it.[35]

The Court of Appeals began by noting that the General Assembly's purpose for passing KRS Chapter 292 went beyond merely protecting Kentucky investors, and it was therefore applicable regardless of whether a customer of Dolomite was a

---

[31] *Id.* (emphasis added).

[32] *Id.* at 528.

[33] 269 S.W.3d 883 (Ky. App. 2008).

[34] *Id.* at 885.

[35] *Id.*

Kentucky resident when they did business with Dolomite.[36] The court then noted that

> the Commonwealth bears the responsibility of supervising the sale, purchase, or the offer to sell or purchase securities in the Commonwealth. **As a part of its supervisory responsibility, the Commonwealth also has broad authority to investigate potential violations of the Kentucky Securities Act**. Under KRS 292.460(2), the Commonwealth has the power to "administer oath [sic] and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, agreements, or other documents or records which the executive director deems relevant or material to the inquiry."[37]

It then echoed both *Pineur* and *Morton Salt* by stating that

> [e]ven if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless **law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest...[It] is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant**.[38]

The Court of Appeals consequently held that the Commonwealth had the power to issue the subpoena because its request was within its authority, the demand was not too indefinite, and the information sought was reasonably relevant to its inquiry.[39] And, because "the broad powers granted to the Commonwealth not only protect Kentucky investors but also serve to preserve the reputation of legitimate Kentucky

---

[36] *Id.*

[37] *Id.* at 886 (internal citations omitted).

[38] *Id.* (emphasis added).

[39] *Id.* at 886-87.

companies and maintain national and international confidence in the Kentucky market."[40]

In this case, as discussed *supra,* the Secretary has been tasked with protecting the financial interests of the state, a duty of such importance that is difficult to overstate. This responsibility also includes being responsible for all procurements under the KMPC, the purposes of which, among other things, are:

> (d) To provide for increased public confidence in the procedures followed in public procurement;
>
> (e) To insure the fair and equitable treatment of all persons who deal with the procurement system of the Commonwealth;
>
> (f) To provide increased economy in state procurement activities by fostering effective competition; and
>
> (g) To provide safeguards for the maintenance of a procurement system of quality and integrity.[41]

All of which are certainly no less important than the purposes of Kentucky's Securities Act as identified in *Dolomite.*

To fulfil these duties, the General Assembly conferred powers of original inquiry to the Secretary that are substantially similar to that of the Office and Financial Institutions in *Dolomite.* Namely, under KRS 45.142—which is entitled "Enforcement of laws; investigation procedure"—to "administer oaths, certify to official acts, issue subpoenas, compel the attendance of witnesses and the production of testimony touching any subject properly under investigation by them, and…compel the

---

[40] *Id.* at 887.

[41] KRS 45A.010.

15

production of books, papers, and accounts." Accordingly, because the Finance and Administration Cabinet is an administrative agency responsible for ensuring the KMPC is followed, and has been armed with the tools necessary to fulfill that duty, it has every right to use those tools to "take steps to inform itself as to whether there is probable violation of the law."[42] This is, of course, so long as "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant."[43][44]

After review of the subpoena issued in this case, it appears to have satisfied the foregoing standard. However, we leave that determination to the sound discretion of the trial court on remand. We would further note that, as with all subpoenas issued in any context, the judiciary provides a solid backstop for any potential overreaches by the Secretary or any other agent of the government in issuing them:

> The court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (a) quash or modify the subpoena if it is unreasonable and oppressive or (b) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things.[45]

---

[42] *Pineur*, 533 S.W.2d at 529.

[43] *Dolomite*, 269 S.W.3d at 886.

[44] In addition, implicit in this test is the requirement that investigations should be undertaken in good faith. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57-58 (1964) (holding that investigations by the Commissioner of the Internal Revenue Service into potential tax fraud must be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to that purpose, that the information is not already within the administrative body's possession, and that the appropriate administrative steps have been followed). The *Powell* court noted that an abuse of subpoena power would occur "if the summons had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. *Id.* at 58.

[45] Kentucky Rule of Civil Procedure 45.02.

16

Based on the foregoing, we hold that the subpoena powers of the Secretary of the Finance and Administration cabinet extend to suspected violations of the KMPC.

**B.     The Secretary has the power to subpoena non-government employees as part of an investigation into a possible violation of the KMPC.**

Lassiter next asserts that, even if the Secretary's authority to issue subpoenas extends to investigations of KMPC violations, the Secretary may only issue subpoenas to current state government employees. Therefore, because Lassiter is no longer a state government employee, the Secretary has no authority to issue a subpoena to him. Again, we disagree.

Before addressing the merits of Lassiter's argument, it will be helpful to make some preliminary comments about the components of KRS 45.142. As we have already noted, KRS 45.142 reads in pertinent part:

> For the purpose of enforcing the provisions of this chapter and those sections of KRS Chapters 41, 45, and 48 relating to the state budget and financial administration, the secretary of the Finance and Administration Cabinet...for [his] respective [branch] of government...shall have free access during business hours to all books, reports, papers, and accounts in the office or under the care or control of any budget unit of [his] respective [branch] of government, and may administer oaths, certify to official acts, issue subpoenas, compel the attendance of witnesses and the production of testimony touching any subject properly under investigation by [him], and may compel the production of books, papers, and accounts.

We agree with the Court of Appeals' conclusion that this statute gives the Secretary two distinct powers of investigation. The first is the "free access" power. It gives the Secretary free access to "all books, reports, papers, and accounts" of any budget unit in the Executive Branch. The second, are powers of original inquiry: to "issue

17

subpoenas, compel the attendance of witnesses and the production of testimony" and, most notably, "compel the production of books, papers, and accounts."

Lassiter insists that because the free access power applies only to budget units of the Executive Branch, the powers of original inquiry must also only apply to budget units of the Executive Branch. But this reading of the statute would render it redundant, and would therefore work an absurd result, which we must assume the General Assembly did not intend.[46] If the Secretary already has free access to "books, reports, papers, and accounts" in the possession of budget units within the Executive Branch, why would he need to "compel the production of books, papers, and accounts" from those budget units via subpoena? Clearly, the powers of original inquiry were granted to the Secretary so that he could, as due diligence requires, gather information from *any* source he believes may have evidence pertinent to a subject properly under his investigation. Particularly in the context of KMPC contracts where the state is contracting with non-government entities, it defies common sense to say that the Secretary can only gather information from state employees and not from the non-government entities that might have been party to allegedly illegal contracts and therefore would almost certainly have valuable evidence in regard to that investigation.

Lassiter further points to KRS 45.990(1), the "Penalties" provision of KRS Chapter 45, which reads:

> [a]ny officer, agent, or employee of any budget unit who willfully fails or refuses to comply with any of the provisions of KRS 45.011 to 45.031, 45.121, **45.142**, 45.151, 45.242,

---

[46] *Rice,* 492 S.W.3d at 564.

18

45.244, 45.251, 45.253, 45.305, or 45.313, or who expends any money in violation of any of the provisions of those sections, **shall be subject to prosecution in the Franklin Circuit Court**, and upon conviction **shall be guilty of a violation**.

Based on this, he asserts that the subpoena power could only be directed at an "officer, agent, or employee of any budget unit." But our duty when interpreting KRS Chapter 45 is to consider it as a whole and give meaning to each of its constituent parts.[47] Thus, when comparison of this statute is made to KRS 45.142, it is clear that this enforcement provision does not identify the scope of the subpoena power.

KRS 45.142 authorizes the Secretary to seek judicial enforcement against "**any** person [who] fails to comply with the order of, or to obey a subpoena issued by [him]...or refuses to testify as a witness to any matters regarding which he may be lawfully interrogated." The statute further provides that the Secretary's recourse in the event that someone refuses to comply is to have a

> judge having jurisdiction of the person to whom the order or subpoena was issued...compel obedience by proceedings for contempt as in the case of disobedience of a subpoena or order issued from such court or a refusal to testify therein, and...adjudge such person guilty of contempt of court and punish him as provided by law in other contempt cases.

In contrast, KRS 45.990 applies solely to officers, agents, or employees of a budget unit that willfully fail or refuse to comply with a number of listed statutes. In that event, the employee can only be found guilty of a violation,[48] not held in contempt of

---

[47] *Id.*

[48] "Offenses are either felonies, misdemeanors, or violations: (3) Offenses punishable by a fine only or by any other penalty not cited herein, whether in combination with a fine or not, are violations." KRS 431.060.

19

court. Further, said employees must be prosecuted in Franklin Circuit Court, not in any court of the Commonwealth "having jurisdiction of the person to whom the order or subpoena was issued." Accordingly, we cannot hold that KRS 45.990 has any bearing on whom may be issued subpoenas under the Secretary's investigative authority.

As a final note, we agree with the Secretary's argument that Lassiter's interpretation would allow a state employee to "embezzle from the Treasury on Monday, resign on Tuesday, and claim to be immune from questioning on Wednesday" simply because he or she is no longer a state employee. This would not only be absurd, but it would also severely handicap the Secretary's abilities to fulfil his duties as the protector and overseer of the Commonwealth's financial well-being. We therefore hold that the Secretary's subpoena power extends to non-government employees as long as the subpoena "[touches] any subject properly under" his investigation and is otherwise proper.

### III.   CONCLUSION

Based on the foregoing, we affirm and remand for proceedings consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:


J. Guthrie True
True Guarnieri Ayer, LLP



COUNSEL FOR APPELLEE:

Samuel R. Flynn
Labor Cabinet

Brian C. Thomas
Kentucky Retirement Systems

Hiren B. Desai
Finance and Administration Cabinet